AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California  ▾

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Apple, Inc., One Infinite Loop, Cupertino, CA 95014<br>(sdis1904@icloud.com ; devinmariee82@gmail.com ;<br>clydethemack@gmail.com ; whoremouth88@gmail.com) | )<br>)<br>)<br>)<br>)<br>)  Case No.    23MJ3972 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846 | Possession with intent to distribute narcotics and conspiracy |
| 18 USC 922(g) | Unlawful possession of a firearm/ammunition |
| 18 USC 924 | Use of firearm during and in relation to any drug trafficking crime |

The application is based on these facts:

See attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

FBI Agent Veronika Fischer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:  ___12/11/2023___

_____
*Judge's signature*

City and state: San Diego, California

Hon. Michael S. Berg, U.S. Magistrate Judge
_____
*Printed name and title*

## **ATTACHMENT A**

Apple Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Infinite Loop, Cupertino, California, 95014.

## ATTACHMENT B

### I. Service of the Warrant

The officer executing the warrant shall permit Apple Inc. (the ISP), as the custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II. Items Subject to Seizure

A. All subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, transactional data and any other files or records for:

**sdis1904@icloud.com;**
**devinmariee82@gmail.com;**
**clydethemack@gmail.com; and**
**whoremouth88@gmail.com.**

B. The search of the data supplied by the ISPs pursuant to this warrant will be conducted by the FBI as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to evidence of violations of 21 U.S.C. Sections 841 and 846 and Title 18 U.S.C. Sections 922(g) and 924 for the period of June 5, 2023, up to and including July 5, 2023, and to seizure of:

A. Communications, records, attachments, files, and data tending to discuss or suggest efforts to acquire and possess firearms and possess and/or transport with the intent to distribute federally controlled substances within the United States;

B. Communications, records, attachments, files, and data tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the illegal acquisition and possession of firearms and the possession and/or transportation with the intent to distribute federally controlled substances within the United States;

C. Communications, records, attachments, files, and data tending to identify co-conspirators, criminal associates, or others involved in the acquisition and

possession of firearms and the possession and/or transportation with the intent to distribute federally controlled substances within the United States;

D.   Communications, records, attachments, files, and data tending to identify travel to or presence at locations involved in the acquisition and possession of firearms and possession and/or transportation with the intent to distribute federally controlled substances within the United States, such as stash houses, load houses, or delivery points; and

E.   Communications, records, attachments, files, and data tending to identify the user(s) of the subject accounts, and any co-conspirators involved in the activities described above;

F.   Communications, records, attachments, files, and data that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of Title 21 U.S.C. §§ 841 and 846 and Title 18, U.S.C. §§ 922(g) and 924.**

# **AFFIDAVIT**

I, Veronika Fischer, being duly sworn, hereby state as follows:

## **INTRODUCTION**

1.     This affidavit supports an application for a warrant to search the following iCloud account(s):

a.     Any and all accounts associated with the following identifiers:

Apple ID sdis1904@icloud.com
Apple ID devinmariee82@gmail.com;
Apple ID clydethemack@gmail.com;
Apple ID whoremouth88@gmail.com (the "**Target Account(s)**")

also described in Attachment A, respectively, and that are stored at premises owned, maintained, controlled, or operated by Apple, Inc. ("Apple"), a social networking, electronic communication, and remote computing service provider whose primary computer information systems and other electronic communications and storage systems, records, and data are located at One Apple Park Way, Cupertino, California.

2.     This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to records and other information in its possession, pertaining to the subscriber or customer associated with the Target Account(s) as described in Attachment A, and seize evidence of crimes, specifically, Title 21 United States Code, Sections 841 and 846 (Possession of Methamphetamine With Intent to Distribute[1]), Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm/Ammunition), and Title 18, United States Code, Section 924 (Use of a Firearm During and in Relation To Any Crime of Violence or Drug Trafficking Crime) ("**Target Offenses**") and conspiracy to commit the same, such evidence being more fully described in Attachment B.

---

[1] Throughout this affidavit, "drugs," "narcotics," and "controlled substances" are used interchangeably.

1

3.      The following is based on my own investigation and my consultations with other experience law enforcement personnel involved in this investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Any conversations and/or discussions provided below are set forth in substance unless noted. My interpretations of certain statements are set forth in parentheses or brackets and are based upon my knowledge of the investigation. Dates and times are approximate.

4.      Because this affidavit is being submitted for the limited purpose of seeking search warrant specified below, I have not set forth each and every fact learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrant.

### EXPERIENCE AND TRAINING

5.      I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

6.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since October of 2022. I am currently assigned to the East County Regional Gang Task Force in El Cajon, California. My duties include the investigation and apprehension of individuals involved in violent gang-related activities as well as drug trafficking and distribution. Prior to joining the FBI, I worked as a Forensic Scientist in Biology/DNA for the Texas Department of Public Safety Crime Laboratory in Austin, Texas.

7.      Prior to being assigned to the FBI San Diego Field Office, I completed the Basic Field Training Course at the FBI Academy in Quantico, Virginia. During New Agent training, which spanned 18 weeks, I received instruction in a variety of investigative techniques commonly used in support of a wide range of the FBI's

investigative priorities. The training included instruction regarding the use of confidential human sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies and skills, forensic techniques, and a variety of other subjects. As an FBI Special Agent, I have performed or participated in various tasks which include, but are not limited to:

      a.    Functioning as a surveillance agent and thereby observing and recording movements of persons, including gang members, trafficking in illegal drugs and weapons, and those suspected of trafficking in illegal drugs and weapons, including conducting surveillance in conjunction with tracker warrants;

      b.    Tracing monies and assets gained by drug traffickers, including gang members, from the illegal sale of drugs and weapons (laundering of monetary instruments);

      c.    Interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of drugs and distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments); and

      d.    Supervising, as a case agent/co-case agent, specific investigations involving the trafficking of drugs and laundering of monetary instruments.

8.    As an FBI Special Agent, I have participated in approximately 12 arrests for narcotics-related and gang-related offenses. I have participated in over 4 investigations that involved various investigative techniques, such as undercover operations, the use of confidential informants, the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotic investigations, or interviews of confidential sources. Through training and participation in these investigations, I have gained valuable insight into the typical makeup and operation of gangs and drug trafficking organizations and the various methods these organizations use to carry out their violent crime and drug trafficking activities.

9.    Finally, I have participated in investigations in which drug traffickers and gang members used various communications platforms, including but not limited to

Snapchat, Facebook, WhatsApp, Signal, and Instagram to communicate with their associates, confidential informants, cooperating individuals, and undercover officers. I have also interviewed individuals who have been directly and indirectly involved in the importation, transportation, and distribution of federally controlled substances. As a result, I am familiar with how drug traffickers communicate with each other and generally conduct business. For example, I am aware that drug traffickers discuss criminal matters over their telephones and encrypted digital communications platforms like Apple iMessage, Facebook, Instagram, WhatsApp, Signal, and they often speak vaguely or in code. This training and experience is the basis for my opinions expressed below.

10.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in illegal firearms possession, trafficking, drug dealing, and trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.     Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs will use Apple services on different associated devices (like iPhones, iPads, and Macbooks) because it allows access to make voice calls and send text messages (including using encrypted communications platforms, such as Apple iMessage, Facebook, Instagram, WhatsApp, and/or Signal), track locations, take and send photos, videos, voice notes, and use third-party digital communications platforms to communicate with other individuals involved in their illegal possession, acquisition, distribution, and trafficking of firearms and drugs.

b.     Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs will use Apple services because those services and their associated devices permit them in many ways to actively monitor the progress of their illegal cargo while it is in transit.

c.     Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs and their accomplices will use Apple

services and associated devices, because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d. Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs will use Apple services that associated devices to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs will use Apple services and associated devices to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. The use of Apple services and associated devices by individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs tends to generate evidence that is stored on the social media account, including, but not limited to chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

**IINFORMATION REGARDING APPLE[2], APPLE ID, AND iCLOUD**

11. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

12. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop

---

[2] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/iCloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.      Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c.      iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.      Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well

as share their location with other iOS users.  It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are physical tracking devices sold by Apple.

f.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.      App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

13.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

14.     Apple captures information associated with the creation and use of an¬ Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the

user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

15.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

16.     Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

17.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple.  Records and data associated with third-party apps, including the instant messaging and voice communication services like Facebook, Instagram, WhatsApp, and Signal may also be stored on iCloud.

18.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

19.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

20.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or

controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

21.   Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

22.   As described above, Apple iPhones come pre-installed applications that are written, maintained and updated by Apple; including but not limited to, Apple Maps, Apple iMessage, Apple Mail, Apple Photos, and Apple Camera. Based upon my training and experience with the Apple iPhone, these Apple Apps are often connected with Appel's iCloud back-up service. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

23.    Specifically, I know a search of this electronically stored information in support of illegal firearms possession, trafficking, drug dealing, and trafficking investigations tends to yield evidence:

a.    tending to indicate efforts to acquire and possess firearms and possess and/or transport with the intent to distribute federally controlled substances within the United States;

b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the, or illegal acquisition and possession of firearms and the possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c.    tending to identify co-conspirators, criminal associates, or others involved in the acquisition and possession of firearms and the possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d.    tending to identify travel to or presence at locations involved in the acquisition and possession of firearms and possession and/or transportation with the intent to distribute federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the Target Account(s); and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

24.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the

crimes under investigation including information that can be used to identify the account's user or users.

25.     In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of illegal firearms possession, trafficking, drug dealing, and trafficking investigations, and the opinions stated below are shared by them. Furthermore, I have personal knowledge of the following facts, or have had them related to me by others who are involved in this investigation.

## JURISDICTION

26.     This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## FACTS SUPPORTING PROBABLE CAUSE

27.     On July 5, 2023, at approximately 10:00 a.m., the San Diego Sheriff's Department (SDSD) served a California state search warrant at 8712 Golden Ridge Road, Lakeside, California 92040, an address associated with Devin ARMER and Lance RODGERS. An Apple iPhone was seized from ARMER, who was holding the device when she was called out of the residence and contacted by law enforcement officers.

28.     While serving the warrant at 8712 Golden Ridge Road, Deputy Tippin searched the bedroom of ARMER and her ex-boyfriend Lance RODGERS. Deputy Tippin discovered two plastic baggies on the brown dresser in the bedroom containing suspected Methamphetamine totaling 31.2 grams, one baggie containing approximately 28 grams and one baggie containing approximately 3.2 grams. Also found in the bottom drawer of the brown dresser on top of the clothing was an un-serialized Glock-style pistol, a pistol holster, and, inside the magazine well of the pistol, a firearms magazine containing eight rounds of 9-millimeter ammunition. Deputy Tippin noted there was both male and female clothing inside the brown dresser drawer where the un-serialized pistol was located. Additionally, in the dresser by the bedroom door, two plastic baggies

containing suspected mushrooms (psilocybin) totaling 3.5 grams, one baggie containing 1.7 grams and one baggie containing approximately 1.8 grams, were discovered.

29.     The ammunition was inspected, and preliminary checks showed that the ammunition was not manufactured in California. Therefore, the ammunition traveled in, and/or affected interstate commerce to arrive in the state of California.

30.     ARMER and RODGERS were arrested on state charges, including Possession of Controlled Substances for Sale in violation of California Health & Safety Code 11351 and Possession of a Controlled Substance while Armed in violation of California Health and Safety Code 11370.1 (A). ARMER and RODGERS were transported to the Lakeside Patrol Station, 12365 Parkside Street, Lakeside, California 92040. Both ARMER and RODGERS were separately read their Miranda rights in different locations at the station. ARMER and RODGERS independently elected to waive their rights and speak to the arresting officers.

31.     During a recorded interview, RODGERS stated that he does not live at the residence and denied that any of the male clothing was his. When asked about the un-serialized pistol, RODGERS denied ownership or any knowledge of the pistol. When questioned about the Methamphetamine, RODGERS denied having any knowledge of the narcotics. Further, RODGERS denied being involved in any trafficking of narcotics. During the interview, RODGERS consensually provided a DNA sample to interviewing officers.

32.     During a recorded interview of ARMER, ARMER stated that only she and RODGERS have access to her bedroom. When asked about the Methamphetamine found in her room, ARMER stated the quantity was "less than an ounce" and belonged to her. ARMER added that despite the large quantity of Methamphetamine, it was all for personal use and she was not trafficking narcotics. When asked about the un-serialized pistol, ARMER stated that it was not hers. She added that it belonged to RODGERS, but that she was not aware that he had it with him in her bedroom. ARMER stated that she had told RODGERS "constantly" not to bring the weapon to her house. She added

that she had thought that RODGERS' mother had gotten rid of it. ARMER stated that the clothes in the dresser were all hers, but that the gun was not hers and, when asked, stated that she has never even touched the gun.  During ARMER's interview, she provided written consent to interviewing officers to access her phone and provided the unlock code for officers to access the phone.

33.    Record checks on ARMER revealed the following criminal history:

| CONVICTION DATE | COURT OF CONVICTION | CHARGE | TERM OF IMPRISONMENT |
|---|---|---|---|
| 7/15/2019 | CASC – MCEL CAJON | 245(A)(4) PC – ADW with Force: Possible GBI | 365 days' jail, 3 years' probation, fine |

34.    Record checks on RODGERS revealed the following criminal history:

| CONVICTION DATE | COURT OF CONVICTION | CHARGE | TERM OF IMPRISONMENT |
|---|---|---|---|
| 4/24/2001 | CASC – MCEL CAJON | 148(A)(1) PC – Obstruct Public Officer (M) | 26 days' jail, 3 years' probation |
| 7/8/2002 | CASC – MCEL CAJON | 148(A)(1) PC – Obstruct Public Officer (M) | 26 days' jail, 3 years' probation |
| 7/8/2002 | CASC – SAN DIEGO | 10851(A) VC – Vehicle Theft | 240 days' jail, 3 years' probation (8/26/2003 probation reinstated – 365 days' jail) |
| 8/26/2003 | CASC – VISTA BRANCH | 459 PC – Burglary | 365 days' jail, 3 years' probation |
| 5/10/2004 | CASC – SAN DIEGO | 459 PC – Burglary (Two counts) 487(D) PC – Grand Theft Auto | 2 years' jail |

| | | 10851(A) VC – Vehicle Theft (Two counts) | |
|---|---|---|---|
| 9/23/2014 | CASC – SAN DIEGO | 459 PC – Burglary | 3 years' jail |
| 3/26/2018 | CASC – MCEL CAJON | 148(A)(1) PC – Obstruct Public Officer (M) | 150 days' jail |
| 11/18/2019 | CASC – MCEL CAJON | 29800 (A)(1) PC – Felon Possess Firearm<br><br>530.5(A) PC – Get Credit Using Another's ID | 4 years' prison<br><br><br><br>16 months' prison (consecutive) |
| 11/18/2019 | CASC – MCEL CAJON | 459 PC – Burglary | 16 months' prison (consecutive) |

35.     Based on my training and experience, I know that individuals who distribute controlled substances often obtain firearms, sometimes via illegal channels, for personal safety and protection. These firearms are often purchased, sold, and traded amongst other gang members and/or distributors of controlled substances. "Ghost gun" is a term used to refer to unregulated firearms that anyone (including minors and those prohibited to purchase firearms) can buy and build without the need for a background check. Ghost guns are un-serialized and untraceable and can be purchased online and assembled at home. The presence of the un-serialized Glock-style pistol located at 8712 Golden Ridge Road indicates that ARMER and RODGERS took measures to obtain a firearm that was untraceable likely in order to provide personal protection while they were distributing and conspiring to distribute Methamphetamine.

36.     Subsequently, Deputy Tippin utilized a Thermo Fisher Scientific TruNarc Handheld Narcotics Analyzer device to test the seized narcotic evidence. The TruNarc Analyzer indicated that the substance in the baggies seized from ARMER's bedroom at 8712 Golden Ridge Road tested presumptively positive for Methamphetamine. On August 30, 2023, the Drug Enforcement Agency (DEA) Southwest Laboratory

confirmed the total net weight of the Methamphetamine was 29.6 grams (pure), one exhibit as 27.1 grams at ±1.7 grams and the other as 2.9 grams at ±0.3 grams.

37.     On July 7, 2023, Deputy Young conducted a consent search of ARMER's cellphone, an Apple iPhone 13 Pro Max cellular telephone, IMEI 356370164108646. During that search, Deputy Young discovered numerous photos of RODGERS in possession of a pistol that appears to match the un-serialized pistol seized during the search.



38.     Deputy Young also discovered Apple iMessage text conversations between ARMER and a contact listed as "Karen", believed to be RODGERS' mother Karen RODGERS. In the text conversation detailed below, ARMER and "Karen" discuss RODGERS' possession of the pistol and are unsure of what to do about stopping him from carrying it.

> **Karen:** "Does that gun work I see bullets on his floor".
>
> **ARMER:** "Yes it absolutely works he had it on him LASTNIGHT and that's the second time he tried getting in my car with it he's not in the right state of mind to be having that shjt he's gonna seriously hurt himself or something".

**Karen:** "Holy smoke what should I do with it should I hide it and then he's gonna yell at me."

**ARMER:** "I would he's got 2 of them"

**Karen:** "oh brother OK I guess I will".

**ARMER:** "Tell him I hid them Blame me".

**Karen:** " No he'll go absolutely freaking crazy."

**ARMER:** "And I'll tell him I hid them and gave them to Bridgette he wont shit cause he don't even wanna try testing those waters out with her".

39.   Also, during the search of ARMER's phone, Deputy Young discovered various additional iMessage text communications with identified and unidentified contacts discussing narcotics trafficking. In one conversation on July 3, 2023, at approximately 12:29 a.m., a contact with the name "Arbbbyy" using cellular telephone number (702) 508-8555 had a text conversation with ARMER.

**Arbbbyy:** "?"

**ARMER:** " I can get it but it's going to be pricey cause Jurko is out."

**Arbbbyy:** "How much is pricey".

**ARMER:** "Like 750" [$750.00]

**Arbbbyy:** "Damn ... give me 2 min and ill let you know"

**Arbbbyy:** "Thx but I got it a little cheaper"

**ARMER:** "Ok good I didn't want to have to pick it up Lmfao to far"

40.   Based on my training and experience, I know $750 is a reasonable amount to be paid for approximately a quarter pound of methamphetamine.

41.   Deputy Young also discovered a Facebook Messenger conversation, on June 9, 2023, at approximately 10:24 a.m., David DOW, date of birth September 13, 1980, texted ARMER,

**DOW:** "I need some ??"

**ARMER:** "How much money you got"

**DOW:** "how much for a oz"

**ARMER:** "I don't have that"

**DOW:** "How much you got".

**ARMER:** "Maybe a ball"

**DOW:** "Take it how much"

**ARMER:** "what would steven charge

**DOW:** "40 bucks".

42.     Based on my training, experience, and understanding of this investigation this conversation is for the sale of narcotics. Additionally, the narcotics slang "ball" refers to an "eight ball" or an eight of an ounce which is approximately 3.5 grams.

43.     As described above, law enforcement previously reviewed certain contents of the Apple iPhone seized from ARMER pursuant to her consent. And law enforcement also searched the iPhone pursuant to a warrant signed by the Honorable Steve B. Chu on September 21, 2023. *See* 23-MJ-3465. But evidence previously located on the device during the earlier consent-based search did not appear on the returns from the search pursuant to a warrant; it appears certain messages on the iPhone were set to delete after 30 days. But the warrant return appeared to reflect that the iPhone contained Apple IDs matching the **Target Accounts** and that an iCloud account was "present." Agents hope to recover more robust information from the cellphone from the **Target Accounts.**

44.     In my training and experience, the illegal possession, acquisition, distribution, and trafficking of firearms and drugs and related conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual distribution event. Coconspirators communicate with one another in efforts to ensure success in getting their valuable cargo to the distributor who will conduct end-user sales. In this case, I believe the coordination between ARMER, RODGERS, and others likely began at least one month before the July 05, 2023 arrest. A total of 31.2 grams of Methamphetamine is a significant quantity and thus necessitates a significant level of coordination and communication in order to sell and/or distribute. Therefore, I

respectfully request permission to search the **Target Account(s)** for evidence of the **Target Offenses** from June 5, 2023 to and including July 5, 2023.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

45.    Law enforcement previously reviewed the contents of ARMER's cellphone pursuant to her consent. And on September 21, 2023, the Honorable Steve B. Chu, United States Magistrate Judge for the Southern District of California, authorized a search of ARMER's cellphone [23-MJ-03465].  However, evidence previously located on the device during a consent search was absent after the execution of the search warrant. Investigators were able to determine that a setting on the device was set to store iMessages for only 30 days prior to their deletion.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

46.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

47.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Apple are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Apple for the relevant accounts and then to analyze the contents of those accounts on the premises of Apple. The impact on Apple business would be disruptive and severe.

48.    Therefore, I request authority to seize all content as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Apple to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively

pursue this investigation, The FBI seeks authorization to allow Apple to make a digital copy of the entire contents of the account(s) subject to seizure.  That copy will be provided to me or to any authorized federal agent. The copy will be imaged, and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

49.     Analyzing the data to be provided by Apple may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Apple does not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

50.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by Apple, examiners may need to review each record to determine

if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

51.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

52.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**CONCLUSION**

53.     Based on all of the facts and circumstances described above, there is probable cause to conclude that ARMER used/uses the **Target Account(s)** to facilitate the illegal possession, acquisition, distribution, and trafficking of firearms and drugs, namely Methamphetamine, and conspiracy to commit the same.

54.     There is probable cause to believe that evidence of illegal activities committed by the targets of the investigation continues to exist on the **Target Account(s)**. As described in the Probable Cause section, I believe that this search should extend to all evidence described in Attachment B in existence for the Target Account(s) from June 5, 2023 up to and including July 5, 2023.

55.     Based on the foregoing, I request that the Court issue the proposed search warrant.

56.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

I swear that the foregoing is true and correct to the best of my knowledge and belief.

_____
Veronika Fischer
Special Agent
Federal Bureau of Investigation

Sworn and attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 11th day of December 2023.

_____
The Honorable MICHAEL S. BERG
United States Magistrate Judge